**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| **DAVID YORK**, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. V-10-55** |
| | § | |
| **TROPIC AIR, LTD.**, *et al.*, | § | |
| Defendants. | § | |

**MEMORANDUM OPINION & ORDER**

Pending before the Court is Defendant Tropic Air Ltd.'s ("Tropic Air") Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Dkt. No. 36), to which Plaintiffs David and Gay York ("Plaintiffs") have responded (Dkt. No. 71), and Tropic Air has replied (Dkt. No. 96). Having considered the motion, response, reply, record, and applicable law, the Court is of the opinion that Tropic Air's motion should be **DENIED**.

**I. Factual and Procedural Background**

Plaintiffs are individuals residing in Harris County, Texas; Defendant Tropic Air is a foreign corporation with its principal place of business in San Pedro, Belize; and Defendant Pratt & Whitney Canada Corp. ("Pratt & Whitney") is a foreign corporation with its principal place of business in Quebec, Canada.

This action arises from the September 7, 2008 crash of a Cessna Caravan 208B aircraft allegedly powered by a Pratt & Whitney engine and owned and operated by Tropic Air (hereinafter "subject aircraft"), during which Plaintiffs claim they were injured. Plaintiffs filed suit against Tropic Air for negligent inspection, operation, and maintenance of the aircraft, and against Pratt & Whitney for negligent design, manufacture, and marketing.

Tropic Air now moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), claiming it does not have sufficient minimum contacts with the State of Texas for the Court to

exercise jurisdiction over it. Tropic Air further moves to dismiss pursuant to Federal Rule of

Civil Procedure 12(b)(3) for improper venue.

## II. Whether Personal Jurisdiction is Proper Pursuant to FED. R. CIV. P. 12(b)(2)

### A. Legal Standard

In a diversity action, a federal court may exercise personal jurisdiction over a nonresident

defendant only to the extent permitted by the applicable law of the forum state. *Cent. Freight Lines,*

*Inc. v. APA Transport Corp.*, 322 F.3d 376, 380 (5th Cir. 2003). In this case, the Texas long-arm

statute extends to the limits of due process. *Id.* Therefore, the inquiry collapses into whether Texas

can exercise personal jurisdiction over Tropic Air consistent with the Due Process Clause of the

Fourteenth Amendment. *See Id.*

The due process inquiry has two components. First, "the defendant purposefully must have

established minimum contacts with the forum state, invoking the benefits and protections of that

state's laws and, therefore, reasonably could anticipate being haled into court there." *Command–Aire*

*v. Ontario Mech. Sales & Serv., Inc.*, 963 F.2d 90, 94 (5th Cir. 1992). Second, "the exercise of

personal jurisdiction, under the circumstances, must not offend traditional notions of fair play and

substantial justice." *Id. See also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846,

2851 (2011); *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 108–16 (1987);

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); *World–Wide*

*Volkswagen Corp. v. Woodson*, 444 U.S. 286, 287 (1980); *Int'l Shoe Co. v. Washington*, 326 U.S.

310, 316 (1945)).

Personal jurisdiction exists in two forms, general and specific. General jurisdiction exists

when a defendant's contacts with the forum state are "continuous and systematic" but are not related

to the alleged cause of action. *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 419

(5th Cir. 1993) (citing *Helicopteros*, 466 U.S. at 415). Specific jurisdiction exists when a nonresident

defendant has "purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Cent. Freight Lines*, 322 F.3d at 381 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Here, Plaintiffs claim that the Court has general jurisdiction over Tropic Air. General jurisdiction requires a more substantial showing of contacts with the forum state than does specific jurisdiction. *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987) (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447–48 (1952)).

When a defendant raises an objection to the court's personal jurisdiction, the burden is on the plaintiff to make a *prima facie* showing that jurisdiction exists. *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990). A *prima facie* case may be established "by alleging facts in the complaint and affidavits sufficient to establish jurisdiction over the non-resident defendants." *Caldwell v. Palmetto State Sav. Bank*, 811 F.2d 916, 917 (5th Cir. 1987) (per curium). "This court must resolve all undisputed facts submitted by the plaintiff, as well as all facts contested in the affidavits, in favor of jurisdiction." *Luv N' Care, Ltd. v. Insta–Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (citing *Wyatt v. Kaplan*, 686 F.2d 276, 280 (5th Cir. 1982)).

In only three decisions since *International Shoe* has the Supreme Court considered whether an out-of-state corporate defendant's in-state contacts were sufficiently "continuous and systematic" to justify the exercise of general jurisdiction over claims unrelated to those contacts, with the results going both ways given the specific facts of each case. *Goodyear*, 131 S.Ct. at 2852 (out-of-state defendants were not subject to personal jurisdiction in North Carolina where defendants were not registered to do business in North Carolina; had no place of business, employees, or bank accounts in North Carolina; did not design, manufacture, or advertise their products in North Carolina; did not solicit business in North Carolina; and did not sell or ship their product to North Carolina customers); *Helicopteros*, 466 U.S. at 408 (survivors of U.S. citizens who died in crash of helicopter

owned by Columbian corporation could not maintain wrongful-death actions against the corporation in Texas, where the company's contacts with Texas "consisted of sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from [a Texas enterprise] for substantial sums; and sending personnel to [Texas] for training"); *Perkins*, 342 U.S. at 448 (general jurisdiction appropriately exercised over Philippine corporation sued in Ohio during WWII, where the corporation's president maintained his office there, kept the company files in that office, and supervised from the Ohio office "the necessarily limited wartime activities of the company").

A review of decisions in this Circuit involving general jurisdiction over out-of-state defendants also shows that "*in personam* cases require a highly fact-sensitive analysis," with results going both ways. *Kervin v. Red River Ski Area, Inc.*, 711 F. Supp. 1383, 1391 (E.D. Tex. 1989). For example, in *Bearry v. Beech Aircraft Co.*, 818 F.2d 370, 376—77 (5th Cir. 1987), Beech Aircraft ("Beech") was a foreign corporation not qualified to do business in Texas. Although Beech did engage in national marketing that reached Texas and its products were sold to independent Texas dealers, the Fifth Circuit held that Beech was not subject to general jurisdiction in Texas. In reaching this conclusion, the court relied on the fact that Beech had never been qualified to do business nor maintained an agent for service of process in Texas; had no telephone listing in Texas; had no warehouse or manufacturing facilities in Texas; had never had a bank account in Texas; had never insured any person in Texas; owned no real estate in Texas; had not paid taxes to the State of Texas; and had no employees or directors who were permanently assigned to work in Texas. *Id.* at 372. Likewise, in *Wenche Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 181 (5th Cir. 1992), the Fifth Circuit held that the defendant company—which had no employee, officer, director, interest in real property, bank account, or office in Texas—was not subject to general jurisdiction in Texas,

even though the company had an agent for service of process in Texas and operated a wholly-owned subsidiary transacting business in Texas. In *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 779 (5th Cir. 1986), the Fifth Circuit held that while "[n]one of [the defendant]'s various contacts with Texas, alone, would support an exercise of general jurisdiction," when considering the individual defendant's contacts with Texas *in toto*—which included frequent journeys into Texas for personal and recreational purposes, ownership of real property in Texas unrelated to the litigation, and the defendant's status as an investor and former director of a Texas corporation—the court concluded that general jurisdiction was appropriate. Finally, in *Wilkinson v. Carnival Cruise Lines, Inc.*, 645 F. Supp. 318, 319—20 (S.D. Tex. 1985), Judge Hayden Head of the Southern District of Texas concluded that the defendant cruise ship line was subject to general jurisdiction in Texas based on its relationships with various local travel agencies and extensive marketing directed toward Texas consumers, despite the fact that the defendant maintained no offices in Texas, had no bank accounts in Texas, had never sailed one of its ships into or out of Texas ports, and had not entered into a written contract with any Texas business in the last five years.

### B. Analysis

#### 1. Contacts

As the parties seeking to invoke this Court's jurisdiction, Plaintiffs bear the burden of establishing contacts to submit Tropic Air to the jurisdiction of this Court. *See Bullion*, 895 F.2d at 216—17. Here, Plaintiffs argue that Tropic Air has intentionally structured its business affairs such that is has a general business presence within the state. Specifically, Plaintiffs have submitted evidence that, during the relevant jurisdictional period, Tropic Air:

(1)    was listed in the Harris County, Texas Yellow Pages in 2007, 2008, 2009, and 2010 (Dkt. No. 71, Ex. K);

(2)    maintained a Post Office box in Dallas, Texas for financial purposes (Dalsin Dep., Dkt. No. 71, Ex. B at 10:18—11:10, 84:23—85:14, 107:6—08:14);

(3)    maintained a telephone land line in Harris County, Texas that had a Houston, Texas area code and served as the base for Tropic Air's toll free telephone reservations line, which was answered as a local call from Houston (Dkt. No. 71, Ex. L; Schulte Dep., Dkt. No. 71, Ex. C 84:3-6);

(4)    employed a Houston, Texas resident as a bookkeeper/CPA, who performed services for Tropic Air in Texas (Dalsin Dep. at 48:12—49:13, 11:7—115:17; Schulte Dep., Dkt. No. 71, Ex. D at 305:1—306:9);

(5)    retained a registered agent for service of process in Texas (Schulte Dep. at 306:10-13);

(6)    chartered aircraft to Texas residents (Dalsin Dep. at 116:1-24; Schulte Dep. at 143:9-20);

(7)    entered into approximately 25—30 contracts with Texas businesses and individuals to sell tickets on its aircraft, which required payment to be made in Texas (Dalsin Dep at 47:17-22; Schulte Dep. at 83:18-24);

(8)    entered into aircraft leases that required the return of aircraft to Texas at the end of lease term (Dkt. No. 71, Ex. H);

(9)    utilized a currency exchange program using its Dallas, Texas bank account (Schulte Dep. at 199:2-5, 208:14—210:12);

(10)    purchased at least one aircraft from Texas (Schulte Dep. at 15:19-22);

(11)    purchased aircraft insurance from a Texas company (Schulte Dep. at 259:22—261:7; Dkt. No. 71, Ex. AO);

(12)    regularly purchased aircraft parts and maintenance services from Texas (Dkt. No. 71, Ex. V);

(13)    shipped aircraft components to Texas for repair (Schulte Dep. at 83:10-14, 290:3-7, 302:24—303:6; Dkt. No. 71, Exs. W, AI, AL, AM, AN);

(14)    purchased advertising from Dallas/Ft. Worth, Texas-based American Airlines (Dkt. No. 71, Ex. J);

(15)    attended multiple trade shows in Texas (Dalsin Dep. at 49:15—50:12; Schulte Dep. at 247:10-18, 256:5—259:21, 262:25—264:1, 324:2-6; Dkt. No. 71, Exs. T, X, AG);

(16)    required nearly all of its sales agents outside of Belize to make payment to its Post Office box in Dallas, Texas, after which the funds were deposited into its Dallas bank account (Dkt. No. 71, Exs. E, F, Y);

(17)    made monthly payments for a parking space at the Harris County, Texas airport (Dalsin Dep. at 8:3-6);

(18) paid for multiple cell phones with Texas area codes through a Texas cell service provider (Dalsin Dep. at 68:6—71:6; Schulte Dep. at 239:19—241:1; Dkt. No. 71, Ex. AP);

(19) employed as its CEO a Texas resident with a Texas driver's license, who regularly conducted business on Tropic Air's behalf while physically present in Texas (Schulte Dep. at 187:17-23, 308:7—317:13);

(20) made monthly payments for internet service in Texas so that its CEO could conduct business on its behalf in Texas (Dalsin Dep. at 55:24—56:5, 62:11—63:9; Schulte Dep. at 323:16-24);

(21) incurred regular charges on its American Express card in Texas (Dkt. No. 71, Ex. T);

(22) incurred expenses related to business meetings at Texas restaurants (Dalsin Dep. at 71:18—72:4);

(23) paid taxes in Texas (Schulte Dep. at 83:15-17, 289:1-8; 319:4-12); and

(24) was involved in a prior lawsuit in Texas (Dalsin Dep. at 29:9-11).

Not one of the above contacts, by itself, would be sufficient for this Court to exercise general personal jurisdiction over Tropic Air. "Determining the existence of personal jurisdiction does not, however, involve an examination of each of [Tropic Air]'s contacts with Texas viewed in isolation from one another. Rather [the Court is] required to examine [Tropic Air]'s contacts *in toto* to determine whether they constitute the kind of continuous and systematic contacts required to satisfy due process." *Holt Oil & Gas*, 801 F.2d at 779. Having considered Tropic Air's various contacts with Texas as set forth below, the Court finds that *in toto*, these contacts are sufficient to satisfy due process.

### a. Tropic Air's Texas Bank Account

Plaintiffs have presented evidence that, during the entire jurisdictional period, Tropic Air continuously utilized a Bank of America bank account in Dallas, Texas for its operations. (Schulte Dep. at 199:6-8.) Tropic Air's CEO, Stephen Schulte ("Schulte") admits that "a significant portion of Tropic Air's financial dealings and routine business were done through the bank account in Texas." (*Id.* at 321:6-10.) The record shows that, in its early years, Tropic Air

intentionally opened this account in Texas in order to get access to US currency. (*Id.* at 198:6—199:5.) In later years, the account served as the facilitator for Tropic Air's currency exchange program, whereby third parties are financed by Tropic Air with Belize dollars, which the third parties then repay to Tropic Air in U.S. dollars through the Texas account. (Schulte Dep. at 199:2-5, 208:14—210:12; Dalsin Dep. at 100:9—101:14, 106:6—107:1.) The record further reflects that Tropic Air has intentionally chosen Bank of America in Dallas, Texas to receive payments from customers because it is more expeditious, convenient, and safer than Belize. (Dalsin Dep. at 84:23—85:14.) According to Tropic Air CFO Sarah Dalsin ("Dalsin"), Tropic Air requests that those who owe it money make payment in Texas because it is more reliable and Tropic Air "need[s] to have those funds there." (Dalsin Dep. at 75:4-13.) Finally, Tropic Air intentionally chose to have its Texas bank statements mailed to its Houston, Texas address. (Schulte Dep. at 200:11-19.)

Plaintiffs have presented additional evidence that Tropic Air's Texas bank account is integral to its business practices, as: (1) the account was used to make aircraft lease payments, including payments on the subject aircraft (Schulte Dep. at 199:12—200:1; (2) Tropic Air has an American Express card that is mailed to its Houston, Texas address, and the monthly bill is paid from the Dallas account (Dalsin Dep. at 22:2-9; Dkt. No. 71, Ex. T); (3) Tropic Air sends U.S. dollar funds it receives in Belize to Dallas to be deposited in the account on a monthly basis (Dalsin Dep. at 73:18—75:24); (4) Tropic Air has paid its aircraft maintenance expenses out of the account (Dalsin Dep. at 97:17-19); (5) Tropic Air has paid commissions to aircraft sales brokers for selling Tropic Air-owned U.S. registered aircraft out of the account (Dalsin Dep. at 97:20—99:2); (6) Tropic Air personnel were physically present in Texas and made counter and cash deposits into the account on multiple occasions (Dalsin Dep. at 101:19—102:7, 104:18-25; Schulte Dep. at 210:13—211:10); (7) Schulte regularly uses a Visa debit card linked to the

account when he is physically present in Texas (Dalsin Dep. at 103:23—104:14, Schulte Dep. at 202:8—204:21); and (8) at least one engine overhaul has been paid for from the account (Dalsin Dep. at 102:8—103:2.)

Tropic Air argues that the majority of its funds are held in its three Belize bank accounts (Dalsin Aff., Dkt. No. 96, Ex. F ¶ 21), and it only set up the bank account in Texas primarily to deal with U.S. and Canadian vendors that required payment in United States dollars, in light of the inability of Belize banks at that time to convert Belize currency—not for its own financial gain. (Schulte Supp. Aff., Dkt. No. 96, Ex. G ¶ 10.) Tropic Air further maintains that although it received payments from persons or entities through the account, paid for goods and services in Texas from the account, and engaged in currency exchange transactions with third parties, this should not weigh in favor of personal jurisdiction because none of this *required* the use of a Texas based bank account.

"Whether or not a defendant possesses a bank account in Texas is a factor traditionally considered in determining whether that defendant is subject to the general jurisdiction." *El Puerto de Liverpool, S.A. de C.V. v. Servi Mundo Llantero, S.A. de C.V.*, 82 S.W.3d 622, 631 (Tex. App.— Corpus Christi 2002, *reh'g den'd en banc*); *cf. Bearry*, 818 F.2d at 372 (taking into account that the defendant "never had a bank account in Texas"). Here, similar to the nonresident defendant in *El Puerto*, Tropic Air "decided to utilize the bank in Dallas in order to have [U.S.] dollars that the company could not have" in Belize. *See El Puerto*, 82 S.W.3d at 632.

Even if the Court accepts Tropic Air's claim that it initially set up the Texas account primarily to deal with vendors that required payment in dollars, the record shows that Tropic Air also used the account for a number of other purposes to directly facilitate its business. Further, while it may be true that none of Tropic Air's activities *required* a Texas bank account, the Court cannot ignore the fact that Tropic Air has intentionally profited from the benefits provided by

this account, all the while protected by Texas and federal banking laws. The fact that Tropic Air maintains a bank account in Texas, by itself, would not be enough to establish general jurisdiction. However, Tropic Air's continuous and systematic utilization of its Texas bank account is a relevant factor in this Court's jurisdictional analysis.

### b.  Tropic Air's Contracts with Texas-Based Sales Agents

Plaintiffs have presented evidence that Tropic Air utilizes a number of Texas residents and businesses for the sale of tickets on Tropic Air flights. (Dalsin Dep. at 29:22—39:11.) Each of Tropic Air's Texas sales agents enters into a contract with Tropic Air that specifically authorizes the travel agent or agency to issue tickets on Tropic Air's behalf as a "limited agent." (Schulte Dep. at 37:9—40:8; Dkt. No. 71, Ex. E.) These contracts are written by Tropic Air and are intended to be ongoing business relationships. (Dalsin Dep. at 14:9—18:10.) Texas is home to more than 15% of the U.S.-based travel agents with whom Tropic Air contracts (Dalsin Dep. at 47:23—48:2), and Tropic Air has at least 97 contracts with sales agents from Texas and around the world that require payment to occur in Texas. (Schulte Dep. at 58:6—59:19.)

"On several occasions, [the Fifth Circuit] has observed that merely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction." *Holt Oil & Gas*, 801 F.2d at 778 (citing *Colwell Realty Investments v. Triple T Inns*, 785 F.2d 1330, 1334 (5th Cir. 1986); *Stuart v. Spademan*, 772 F.2d 1185, 1192—93 (1985); *Burger King*, 471 U.S. 462). However, courts in this Circuit have relied upon a non-resident's business relationships with travel agencies within the forum state as a jurisdictional factor. In *Kervin v. Red River Ski Area, Inc.*, 711 F. Supp. 1383, 1392 (E.D. Tex. 1989), the Eastern District of Texas relied upon an out-of-state defendant's conduct of business with Texas-based travel agencies in its exercise of general jurisdiction. The Southern District of Texas has also relied upon ticket sales via travel agencies in the exercise of jurisdiction of a non-resident defendant.

*See Wilkinson*, 645 F. Supp. at 320—21 (recognizing that defendant served the Texas market through its relationship with Texas travel agents).

Tropic Air has presented evidence that it does not authorize the travel agents with whom it contracts to market on its behalf, it does not know who these agents contact, and it does not keep a marketing list or mailing list of passengers. (Dalsin Aff. ¶ 15.) As such, Tropic Air claims that "it would be imprudent to suggest that simply by establishing agreements with a few travel agents in Texas that Tropic Air is attempting to reach a Texas market." (Dkt. No. 96 at 14.) However, Tropic Air President John Greif ("Greif") admitted that by entering into these agreements with Texas-based travel agents, Tropic Air fully realized it was serving the Texas market:

> Q. Fair to say that you—it was foreseeable to you and you realize that by
>    having ticket agents in Texas, they would sell to Texas residents?
>
> A. Yes.

(Greif Dep., Dkt. No. 71, Ex. G at 41:12-15.) Finally, the Court recognizes that, by contracting with Texas travel agents, Tropic Air has committed an act that *per se* constitutes doing business in Texas under Texas law. *See* TEX. CIV. PRAC. & REM. CODE § 17.042(1) (providing that "a nonresident does business in this state if the nonresident contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state").

The fact that Tropic Air contracts with travel agents and agencies in Texas, by itself, would not be enough to establish general jurisdiction. However, the Court finds that through these ongoing relationships with Texas travel agents, Tropic Air "serves and seeks to serve the Texas market." *Wilkinson*, 645 F. Supp. at 320—21.

### c. Tropic Air's Aircraft Acquisitions

Plaintiffs have presented evidence that, in an ongoing business practice, the leases for a number of Tropic Air's aircraft require payments to be made in Texas, and some leases require

the aircraft to be returned to the lessor in Houston, Texas at the lease's expiration. (Schulte Dep. at 116:5—118:4; Greif Dep. at 29:22—30:10; Dkt. No. 71, Ex. H.) Tropic Air CEO Schulte also travelled to Texas in 2008 and purchased a Cessna 172 aircraft from Texas-based Tahoe Holdings, LLC on behalf of Tropic Air. (Schulte Dep. at 15:8-22, Greif Dep. at 8:6-25.)

The Supreme Court has stated that "[m]ere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of *in personam* jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Helicopteros*, 466 U.S. at 409—10. Because Plaintiffs have not alleged that aircraft that gave rise to this litigation was leased and/or purchased in Texas, Plaintiffs' evidence concerning Tropic Air's aircraft acquisitions is not significant to the Court's jurisdictional analysis.

### d. Tropic Air's website

Plaintiffs have presented evidence that Tropic Air operates an interactive website by which individuals around the world, including Texas, can purchase tickets on the airline. (Schulte Dep. at 18:5—19:23; Dalsin Dep. at 94:19—95:7.) Approximately 33% of Tropic Air's overall business is booked through this website, which allows visitors to search for flights, book fares online, and pay online at the time of purchase via an integrated credit card processing service. (*Id*; Dalsin Dep. at 115:23-25, 134:6-13.) Plaintiffs presented evidence that Tropic Air sold 7,201 tickets to persons with a credit card that had a Texas billing address during the period September 2006 to August 2010 (Dkt. No. 71, Ex. AC), which equates to an average of 6.58 passengers with a Texas billing address per day.

Tropic Air concedes that it maintains an interactive website whereby customers can purchase airline tickets online, but claims that because reservations are processed via PayPal or Verisign, and Tropic Air keeps only billing addresses, it has no means for determining where any particular passenger actually resides.

When considering whether a website gives rise to personal jurisdiction, the Court looks to the Fifth Circuit's decision in *Mink v. AAAA Development, LLC.*, 190 F.3d 333 (5th Cir. 1999), which adopted the Western District of Pennsylvania's reasoning in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997). In adopting the court's analysis in *Zippo*, the Fifth Circuit broke these down as follows:

> At the one end of the spectrum, there are situations where a defendant clearly does business over the Internet by entering into contracts with residents of other states which "involve the knowing and repeated transmission of computer files over the Internet. . . ." In this situation, personal jurisdiction is proper. At the other end of the spectrum, there are situations where a defendant merely establishes a passive website that does nothing more than advertise on the Internet. With passive websites, personal jurisdiction is not appropriate. In the middle of the spectrum, there are situations where a defendant has a website that allows a user to exchange information with a host computer. In this middle ground, "the exercise of jurisdiction is determined by the level of interactivity and commercial nature of the exchange of information that occurs on the Website."

*Mink*, 190 F.3d at 336—37 (internal citations omitted).

Under the *Zippo* analysis, the Court finds that Tropic Air's website falls under the highly interactive category by offering customers the ability to search for flights, book travel, and pay fares. Still, "the fact that [Tropic Air] maintains a highly interactive website *by itself* would not be enough to establish general jurisdiction, as a number of courts have found." *See Coremetrics, Inc. v. Atomic Park.com, LLC*, 370 F. Supp. 2d 1013, 1019 (N.D. Cal. 2005) (italics in original) (citing *Estate of Stephen Bank v. Swiss Valley Farms, Co.*, 286 F. Supp. 2d 514, 518 (D. Md. 2003) ("Without evidence of actual sales made to Maryland residents, it would seem that the operation of a website that merely offers the possibility of transacting cannot be characterized as anything more than 'advertising and solicitation,' and thus is . . . insufficient for jurisdictional purposes."); *Molnlycke Health Care AB v. Dumex Medical Surgical Products Ltd.*, 64 F. Supp. 2d 448, 451 (E.D. Pa. 1999) ("hold[ing] that the establishment of a website through which customers can order products does not, on its own, suffice to establish general jurisdiction"

because this "would effectively hold that any corporation with such a website is subject to general jurisdiction in every state"); *Coastal Video Communications Corp. v. Staywell Corp.*, 59 F. Supp. 2d 562, 571 (E.D. Va. 1999) ("When conducting the general jurisdiction analysis, it is not enough to find that an interactive website has the potential to reach a significant percentage of the forum state's population. . . . In traditional terms, the placing of a store or salesmen in a state is not sufficient to confer general jurisdiction over a defendant without some evidence that the store or salesman actually generated sufficient sales in the forum state for the contact to be considered continuous and systematic."); *E-Data Corp. v. Micropatent Corp.*, 989 F. Supp. 173, 176—77 (D. Conn. 1997) (rejecting plaintiff's reliance on national and international character of Internet to show that defendant's Internet advertising had potential to reach and solicit forum residents; "[i]f such potentialities alone were sufficient to confer personal jurisdiction over a foreign defendant, any foreign corporation with the potential to reach or do business with Connecticut consumers by telephone, television or mail would be subject to suit in Connecticut"); 16-108 MOORE'S FED. PRAC.—CIV. § 108.44 & n.21).

Here, the record shows that Tropic Air generated significant sales to persons with a Texas address through its website, thus providing additional support for this Court's exercise of general jurisdiction. *See Coremetrics*, 370 F. Supp. 2d at 1021—24.

### e.  Tropic Air's Utilization of Andrew Francis

Plaintiffs have presented evidence that Tropic Air hired and designated Houston, Texas resident Andrew Francis ("Francis") as a registered agent for service of process for its multiple aircraft lease agreements with Cessna Finance Corporation. (Schulte Dep. at 24:16—26:8; Greif Dep. at 59:3—60:24; Dkt. No. 71, Exs. H, AE, AF.) Tropic Air also employed Francis as a bookkeeper and an accountant during the relevant jurisdictional time period. (Schulte Dep. at 23:15—24:15.) Francis receives Tropic Air's bank statements at his own address, uses them to

create a spreadsheet that consolidates the information, and then sends the information to Tropic Air in Belize. (Dalsin Dep. at 114:16—115:19.) Francis also receives and forwards packages integral to Tropic Air's operations, including aviation charts on which Tropic Air relies for flight operations. (Schulte Dep. at 300:19—301:15.) Tropic Air has paid Francis $433.33 per month in Texas for his services since 2001. (Dalsin Dep. at 114:7-12.)

In response, Tropic Air explains that it utilizes Francis' services in Texas because the mail in Belize is "notoriously unreliable." (Dkt. No. 96 at 18.) Tropic Air further maintains that Francis was designated as a limited agent for service of process with respect to its agreements with Cessna Finance Corporation, and he has not been designated as a general agent for the service of process. Finally, Tropic Air explains that although Francis has also performed some "light bookkeeping" services for Tropic Air in the past, he was never an employee, and he no longer provides this service.

The Supreme Court found in *Helicopteros* that designation of "an agent for the service of process" is a factor in the exercise of general jurisdiction over a non-resident defendant. *See Helicopteros*, 466 U.S. at 411. Although Tropic Air goes to great length to distinguish the services of Francis from that of a "general" agent, Tropic Air cites no authority in support of its position that his designation is entirely irrelevant to the Court's jurisdictional analysis, and the Court is unable to locate any controlling precedent from Texas or the Fifth Circuit.

Tropic Air's continuous and systematic utilization of a Texas resident to provide services to the company while physically located in Texas further supports the Court's exercise of jurisdiction over Tropic Air. *See Kervin*, 711 F. Supp. at 1392. Regardless of whether Francis is technically an employee or an independent contractor, he is still performing business functions for Tropic Air, at Tropic Air's direction, while physically present in Texas. Finally, the fact that Francis no longer provides any bookkeeping services for Tropic Air is irrelevant to the Court's

analysis, as the Fifth Circuit has explicitly stated that "[g]eneral jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." *Access Telecom, Inc. v. MCI Telecomm'cns Corp.*, 197 F.3d 694, 717 (5th Cir. 1999) (citing *Metropolitan Life Insurance Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 569 (2d Cir. 1996)).

Tropic Air's relationship with Francis, by itself, would not be enough to establish general jurisdiction. However, Tropic Air's continuous and systematic utilization of Francis' services in Texas is a relevant factor in this Court's jurisdictional analysis.

### f.   Tropic Air's Marketing and Advertising in Texas

Plaintiffs have presented evidence that Tropic Air has done marketing and solicited business in Texas on a regular basis throughout the jurisdictional period. Tropic Air concedes the company intentionally purchased a business telephone number in Houston, Texas, which was then listed in the Yellow Pages under the airline section. (Dkt. No. 71, Ex. K; Schulte Dep. at 130:24—132:8.) Tropic Air also purchased an advertisement in *American Way* magazine, the in-flight magazine of Dallas/Ft. Worth, Texas-based American Airlines. (Dkt. No. 71, Ex. J.) Tropic Air did so with full knowledge that the ad would reach American Airlines passengers throughout the world, including those travelling through the airline's hub at Dallas/Ft. Worth International Airport. (Schulte Dep. at 66:11—67:19.) Greif testified that Tropic Air also advertised in *Skin Diver* and another diving magazine, both of which are national magazines that have circulation in Texas. (Greif Dep. at 33:15—34:3.) In addition to print adverting in Texas, Tropic Air has sent representatives to Texas to solicit business at trade shows and/or conventions on at least three occasions. (Dalsin Dep. at 49:15—50:12; Schulte Dep. at 247:10-18, 256:5—259:21, 262:25—264:1, 324:2-6; Dkt. No. 71, Exs. T, X, AG.)

Tropic Air claims that while there was a telephone number listed for it in a Texas Yellow Pages, it never requested the listing. (Schulte Aff., Dkt. No. 26, Ex. A ¶ 36.) After Tropic Air was made aware of the listing as a result of discovery related to this litigation, it asked the service provider to delist the number. (*Id.*) Finally, Tropic Air points out that here, there is no evidence that Plaintiffs relied on Tropic Air's purported advertising in Texas, as Plaintiffs purchased their tickets in Belize directly from a Tropic Air ticket counter.

The Supreme Court has held that any advertising "reasonably calculated to reach the State" may be one among many factors which could support the exercise of jurisdiction. *See World–Wide Volkswagen*, 444 U.S. at 295. The Fifth Circuit has since limited this holding, finding that advertising in a nationally circulated publication, without more, is insufficient to confer general jurisdiction. *Growden v. Ed Bowlin & Assoc.*, 733 F.2d 1149, 1151–52 (5th Cir. 1984); *Loumar v. Smith*, 698 F.2d 759, 763–64 (5th Cir. 1983); *see also Kervin*, 711 F. Supp. at 1392 (noting that the Fifth Circuit has considered the products advertised and "how widely the publications were circulated in the state" in making such determinations).

Unlike the decision to advertise in a national publication, however, the "decision to advertise in Texas telephone directories, in and of itself, is a sufficiently purposeful act [to satisfy due process requirements]" under existing Texas Supreme Court precedent. *Loumar*, 698 F.2d at 754 (quoting *Siskind v. Villa Found. for Education, Inc.*, 642 S.W.2d 434, 436 (Tex. 1982)) (alteration in *Loumar*); *see also Access Telecom, Inc. v. MCI Telecomm'cns Corp.*, 197 F.3d 694, 717 (5th Cir. 1999) ("The one contact that could constitute doing business in Texas would be the yellow page ads.") *But see Van Pelt v. Best Workover, Inc.* 798 S.W.2d 14, 17 (Tex. App.–El Paso 1990) (concluding that a listing in the Yellow Pages did not make a *prima facie* showing of personal jurisdiction). Although Tropic Air claims that it did not make a

decision to advertise in the Texas Yellow Pages, "[t]his court must resolve . . . all facts contested in the affidavits, in favor of jurisdiction." *Luv N' Care*, 438 F.3d at 469.

Here, the Court finds that Tropic Air's advertisement in *American Way* could be reasonably calculated to reach Texas consumers, since American Airlines' main hub is in Dallas/Ft. Worth, Texas. Although the fact that Tropic Air has advertised in *American Way*, by itself, would not be enough to establish general jurisdiction, this advertisement combined with Tropic Air's Yellow Pages listing supports an intention to reach a Texas market and is a relevant factor in this Court's jurisdictional analysis.

However, courts in this Circuit have repeatedly determined that attendance at trade shows, even coupled with national advertising, are insufficient contacts for a court to exercise general jurisdiction. *See, e.g.*, *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 585 (5th Cir. 2010) (holding defendant's contacts with Louisiana, which included attendance at two trade shows, were "neither systematic, continuous, nor substantial enough to support general jurisdiction"); *Submersible Systems, Inc. v. Perforadora Central, S.A. de C.V.*, 249 F.3d 413, 421 (5th Cir. 2001) (finding defendant's employees' annual attendance at conference in Texas insufficient to establish jurisdiction); *Stutzman v. Rainbow Yacht Adventures Ltd.*, 2007 WL 415355, 6 (N.D. Tex. Feb. 7, 2007) ("Sending employees to an annual boat show hardly constitutes continuous and systematic contacts necessary to establish personal jurisdiction over [defendant].") As such, Tropic Air's three appearances at trade shows over seven years are not significant factors in the Court's jurisdictional analysis.

### g.  Tropic Air's Relationships with Texas Vendors

Plaintiffs have presented evidence that Tropic Air sent aircraft components to Texas for repair numerous times during the jurisdictional period. (Schulte Dep. at 83:10-14, 290:3-7, 302:24—303:6; Dkt. No. 71, Exs. W, AI, AL, AM, AN.) On at least two occasions, Tropic Air

also purchased aircraft insurance from a Texas company, Sanborn's Insurance. (Schulte Dep. at 259:22—261:7; Dkt. No. 71, Ex. AO.) Finally, Tropic Air purchased the borescope that it used to inspect its Pratt & Whitney PT6 engines from a company in San Antonio, Texas. (Schulte Dep. at 286:23—87:8; Dkt. No. 71, Ex. AJ.)

As recognized in Part II.B.1.c, *supra*, it is well-established that "[m]ere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of *in personam* jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Helicopteros*, 466 U.S. at 409—10. As such, the Court finds that Tropic Air's occasional purchase of aircraft parts and services from Texas are insufficient to support this Court's exercise of general jurisdiction.

### h.  Tropic Air's Alleged Office in Texas

Plaintiffs have presented evidence that, throughout the jurisdictional period, Tropic Air has continuously had all the makings of an office within the State of Texas. Specifically, Tropic Air intentionally purchased a business telephone number in Houston, Texas that forwards calls to Tropic Air's reservations line. (Schulte Dep. at 843-6.) The practical effect of this set-up is that a Texas customer can call a Texas phone number listed to Tropic Air and make a reservation. The published physical address for this listing is a Houston, Texas residence owned by Tropic Air CEO Schulte. ((Dkt. No. 71, Ex. K; Schulte Dep. at 325:24-25.) In addition to the phone line, Tropic Air has outfitted Schulte's residence to allow him to conduct Tropic Air business within Texas by installing a fax machine and high speed internet—all of which were paid for by Tropic Air and used in furtherance of Tropic Air's operations. (Schulte Dep. at 223:19—224:18, 236:2-10; Dkt. No. 71, Ex. S.) Schulte also used a Tropic Air-owned laptop in Texas to conduct business while physically present in Texas on multiple occasions. (Schulte Dep. at 236:11—237:16.)

During the jurisdictional period, Tropic Air also maintained up to five Texas-based cell phone accounts for Schulte and other Tropic Air employees to use to conduct business while traveling in Texas and the U.S. (Dalsin Dep. at 68:6—71:6; Schulte Dep. at 239:19—241:1; Dkt. No. 71, Ex. AP.) Tropic Air also pays a monthly fee to park a van owned by Schulte at Texas airports and pays for a Texas toll tag on the van, both of which Tropic Air deducts as a business expense. (Dalsin Dep. at 8:3-6; Schulte Dep. at 237:17—239:18.) Tropic Air has also paid for fuel and maintenance expenses for the van located in Texas. (Schulte Dep. at 268:1-17.)

Finally, Plaintiffs have presented evidence that Tropic Air holds itself out to the public and its vendors as having a physical address in Texas. For example, Tropic Air has made written representations to the public that it has a Dallas office. (Dkt. No. 71, Ex. Z; Schulte Dep. at 82:1-9.) Moreover, Tropic Air's FedEx account—which Schulte has admittedly used to send shipments while physically present in Texas—is based in Houston, and the bills are received at Schulte's address in Houston. (Schulte Dep. at 242:22—243:23, 247:19—248:3; Dkt. No. 71, Exs. AQ, AR.) Tropic Air also has used Schulte's Houston address to receive computer equipment and office supplies. (Schulte Dep. at 290:20—291:16, 294:7—295:2; Dkt. No. 71, Exs. AS, AT.)

Tropic Air denies that Schulte's home—which he uses about 70 to 80 nights out of the year— is in actuality an office, as Tropic Air has no ownership interest in this property, nor does Tropic Air have any access to this property. (Schulte Supp. Aff. ¶ 5.) Tropic Air also claims that it does not pay any taxes on the home, nor are there any taxes generated or incurred as a result of any business activities at the home. According to Tropic Air, "considering Schulte's home as an office would be akin to considering a hotel room in any city the office of a traveling business person." (Dkt. No. 96 at 23.)

The Court finds that Tropic Air has conducted business while physically present in Texas on a regular basis by continuously utilizing its CEO's Texas home as a de facto Texas office. Although this fact, by itself, would not be enough to establish general jurisdiction, this contact is a relevant factor in the Court's jurisdictional analysis.

### i.  Tropic Air's alleged employees in Texas

Plaintiffs have presented evidence that Tropic Air has had personnel in Texas on a regular basis throughout the jurisdictional period. First, Plaintiffs point out that Tropic Air's CEO is a Texas resident. Despite the fact that Schulte's sworn affidavit states that his principal residence is in Belize (Schulte Aff, Dkt. No. 36, Ex. A at ¶ 1), the record shows that from 2003 to the present, Schulte also swore under oath to the Harris County Appraisal District that his principal residence was his home in Houston, Texas. (Schulte Dep. at 185:16—187:10; Dkt. No. 71, Ex. BA.) Schulte has a Texas driver's license with his Houston address, and he owns a vehicle that is registered and titled in Texas. (Schulte Dep. at 311:7-12; Dkt. No. 71, Ex. BB.) During his deposition testimony, Schulte explicitly admitted that he is a Texas resident:

Q. You agree that you are a Texas resident, correct?

A.  Yes.

(Schulte Dep. at 308:23—309:1.) Schulte admits he engages in activities in furtherance of Tropic Air's business on nearly all of his trips to Texas—which amounts to between 70 and 80 nights per year. (Schulte Dep. at 323:10-20.)

In addition to Schulte, Tropic Air has had a number of other employees present in Texas in furtherance of its business, and Tropic Air's American Express statements show the card is physically used in Texas on virtually a monthly basis. (Dkt. No. 71, Ex. T.) Tropic Air has sent its personnel to Texas for various types of training on numerous occasions, including computer training and training on Thielert aircraft engines. (Schulte Dep. at 84:14-23, 279:2-24, 284:11-

18, 318:10-15; Dkt. No 71, Exs. AW, AX.) Tropic Air has also sent aircraft mechanics to Texas to receive their U.S. Federal Aviation Administration Airframe and Powerplant mechanic licenses. (Schulte Dep. at 302:5-9.)

The fact that Tropic Air has sent personnel to Texas for various types of training is not a significant factor in the Court's analysis. *See Helicopteros*, 466 U.S. at 418—19. Likewise, the fact that Tropic Air employees have made purchases on Tropic Air's behalf in Texas is not important. *See Helicopteros*, 466 U.S. at 409—10. However, the fact that Tropic Air's CEO is a Texas resident, who has routinely conducted business on behalf of Tropic Air while present in Texas over a number of years, is a relevant factor in the Court's jurisdictional analysis.

### j.  Conclusion as to Tropic Air's Texas Contacts

The Court finds that Tropic Air's business activities in and with Texas, *when taken together*, are sufficient to establish general jurisdiction. This conclusion is consistent with the Supreme Court decisions cited *supra*. In holding that continuous and systematic contacts were lacking in *Helicopteros,* the Supreme Court noted the absence of some important contacts:

> Helicol never has been authorized to do business in Texas and never has had an agent for the service of process within the State. It never has performed helicopter operations in Texas or sold any product that reached Texas, never solicited business in Texas, never signed any contract in Texas, never had any employee based there, and never recruited any employee in Texas. In addition, Helicol never has owned real or personal property and never has maintained an office or establishment there. Helicol has maintained no records in Texas and has no shareholders in that State. None of the respondents or their decedents were domiciled in Texas. . . .

466 U.S. at 411—12. Several contacts mentioned by the Supreme Court that were lacking in *Helicopteros*—solicitation of business in Texas, presence of employees and an agent for the service of process in Texas, utilization of an office in Texas, entering into contracts in Texas, and residence of plaintiffs in Texas—are either currently present or have been contacts of Tropic Air with Texas at some point during the relevant jurisdictional period.

The Court's conclusion is also consistent with *Perkins*, which "clarified that a non-resident defendant need only conduct a limited portion of its business in the forum state for general jurisdiction to exist, as long as that limited portion is conducted continuously and systematically." *Kervin*, 711 F. Supp. at 1392. Here, as in *Perkins*, Tropic Air has conducted a "necessarily limited" portion of its affairs in the forum state in a continuous and systematic fashion. *See Perkins*, 342 U.S. at 448. By seeking benefit, advantage, and profit from Texas, Tropic Air has impliedly consented to its laws

### B. Fairness

Now that Plaintiffs have established that Tropic Air purposefully established minimum contacts with Texas, the burden shifts to Tropic Air to demonstrate that the Court's exercise of personal jurisdiction would fundamentally offend "traditional notions of fair play and substantial justice." *See Burger King*, 471 U.S. at 477; *see also Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 276 (5th Cir. 2006). To do so, Tropic Air must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 475. The Fifth Circuit has based such determinations on the following five factors: "(1) the burden on the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the several states in furthering fundamental social policies." *Seiferth*, 472 F.3d at 276.

### 1.  Burden on Tropic Air

Tropic Air argues that defending this case outside of Belize would be an "untenable burden for Tropic Air's two executive personnel, John Greif and Steve Schulte," rendering them "unable to focus on the critical day-to-day management of the company." (Dkt. No. 36 at 22.)

According to Greif, the result of either he or Schulte having to attend trial "would be horrific." (Greif Dep. at 88:15-21.)

Plaintiffs have presented evidence that Greif was unable to specify any burden that would be imposed on Tropic Air:

> Q.  As you sit here today, can you articulate for the Court any hardship on Tropic Air if this case were to proceed in Texas?
>
> A.  No.

(Greif Dep. at 39:11-14.) Greif also admitted that Tropic Air's day-to-day operations do not necessarily require both he and Schulte to be present. (*Id.* at 88:8-11.) Finally, Schulte testified that Tropic Air's own aircraft might be used to transport its officers and employees to Texas for the purposes of trial. (Schulte Dep. at 157:9—158:6.) There are also flights to Texas from Belize every day, as Schulte is well aware given his nearly weekly travel to Texas.

> Q.  During the jurisdictional time period, how many times for both personal and business trips did you go through Texas, approximately, per year?
>
> A.  51 times.

(*Id.* at 321:23—322:1.)

The Parties previously indicated that they will need approximately 48 trial hours—or 6 to 8 days—to try this case. (Joint Case Management Plan, Dkt. No. 13, ¶ 20.) The Court finds that because Schulte is a Texas resident with a home in Texas, who regularly conducts Tropic Air business while in Texas and is in Texas nearly every week, the burden on him to be present in Texas for less than 2 weeks is nominal. *See Holt Oil & Gas*, 801 F.2d at 779—80 (noting that defendant "was not unreasonably inconvenienced by being required to defend the action in Texas" where defendant happened to already be in Texas during the week the case was tried to participate in a golf tournament). Likewise, the fact that Tropic Air may be able to use its own aircraft to transport its officers and employees further lessens any burden related to travel. *See Nogle & Black Aviation, Inc.*

*v. Faveretto*, 290 S.W.3d 277, 285 (Tex. App.—Houston [14th Dist.] 2009) (holding travel is not a significant burden when defendant has aircraft at its disposal). Moreover, the Court finds that "[a]ny burden on [Tropic Air] is easily justified in light of the substantial economic benefits it derives from Texas residents." *See Kervin*, 711 F. Supp. at 1394 (citing *Pedelahore v. Astropark, Inc.*, 745 F.2d 346, 349 (5th Cir. 1984); *Wilkerson*, 554 F.2d at 749).

### 2.   The Interests of Texas

Tropic Air argues that Belize's interest in this matter remains much stronger than that of Texas because: (1) this accident involves a prominent Belize airline, "The Airline of Belize;" (2) the aircraft involved in the incident had a Belize registration; (3) the Tropic Air employees who flew and maintained the aircraft live and work in Belize; and (4) the accident is being investigated by the Belize Department of Civil Aviation. According to Tropic Air, Belize has a great interest in the safety of aircraft flown within Belize, and the only Texas connection remains the residency of the Plaintiffs. While it is true that Belize has a significant interest in this matter, this factor is more germane to a choice-of-law analysis, as opposed to a due process analysis.

The Supreme Court in *Burger King* found that "[a] State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King*, 471 U.S. at 473. Likewise, the Fifth Circuit has held that "[t]he fact that the injured party . . . is a resident of Texas provides Texas with a significant interest in providing a forum for this action." *Holt Oil & Gas*, 801 F.2d at 777 (citing *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1173 (5th Cir. 1985)). Because Plaintiffs are Texas residents, the Court finds that Texas has a significant interest in providing Plaintiffs with a convenient forum for redressing their injuries.

### 3. Plaintiffs' Interest in Obtaining Convenient and Effective Relief

Tropic Air does not address this issue. The Court nonetheless finds that Plaintiffs have a strong interest in obtaining the convenient and efficient relief that can only be provided by a lawsuit in their domicile.

### 4. The Interstate Judicial System's Interest in the Most Efficient Resolution of Controversies

Tropic Air does not address this issue. The Court nonetheless finds that retention of this case would further the efficiency of the judicial system. This case is currently on the Court's active docket and has been given an October 2012 trial setting, approximately six months from the date of this opinion.

### 5. The Shared Interests of Texas and Belize in Furthering Fundamental Social Policies

In an international dispute, courts should "consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction." *Asahi Metal*, 480 U.S. at 115 (italics in original). "Courts must exercise '[g]reat care and reserve . . . when extending our notions of personal jurisdiction into the international field.'" *Id.* (quoting *United States v. First Nat'l City Bank,* 379 U.S. 378, 404 (1965)).

Although Tropic Air does not directly address this issue, it implies similarity between the judicial systems of Belize and Texas, stating that Belize's "independent common law judiciary system" would not impede Plaintiffs' right to relief. (Dkt. No. 36 at 23.) Tropic Air further concedes that this Court can apply the laws of Belize to this action if a conflict-of-law analysis so requires.

In sum, the Court finds that Tropic Air has not made a sufficient showing that litigating this matter in Texas is unfair or unreasonable. Accordingly, the assertion of personal jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment. The Court expresses no

opinion on whether Plaintiffs' claims have any merit; however, the Court finds that, based on Plaintiffs' First Amended Complaint and the evidence on record, Plaintiffs have made an adequate *prima facie* showing that Tropic Air has sufficient contacts with Texas for this Court to exercise personal jurisdiction.

## IV. Whether Venue Is Proper Pursuant to FED. R. CIV. P. 12(b)(3)

Tropic Air has also moved to dismiss on the ground that the Southern District of Texas is not the proper venue under 28 U.S.C. § 1391(a)(2). Specifically, Tropic Air alleges that because Plaintiffs have failed to demonstrate that a substantial part of the events or omissions giving rise to their claims arose in this judicial district, venue is improper and this action must be dismissed pursuant to FED. R. CIV. P. 12(b)(3).

In Plaintiffs' First Amended Complaint, Plaintiffs changed their basis for venue from 28 U.S.C. § 1391(a)(2) to 28 U.S.C. § 1391(d). Section 1391(d) states that a civil action against an alien may be brought in "any district in the State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State." 28 U.S.C. § 1391(d). As stated in Part I *supra*, Tropic Air is a foreign corporation with its principal place of business in Belize, and Pratt & Whitney is a foreign corporation with its principal place of business in Canada. Because aliens may be sued in any judicial district under 28 § 1391(d), the Court finds that venue of this action is proper.

## V. Conclusion

For the aforementioned reasons, Tropic Air's Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Dkt. No. 36) is **DENIED**.

It is so **ORDERED** this 28th  day of March, 2012.

_____
JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE